**Comprehensive Sentencing Mitigation Report**

Case No. 3:22-cr-106-MMH-LLL
Joshua Thomas Brown

United States District Court
Middle District of Florida
Jacksonville Division

Prepared by:
The Cord Strategies Group, LLC
Jacksonville, Florida

## **Contents**

| | |
|---|---|
| Introduction | 1 |
| Mr. Brown's Current Posture | 1 |
| Nature and Characteristics of the Offense/Factors in Mitigation of the Offense | 2 |
| Mr. Brown's General History and Characteristics | 4 |
| Mr. Brown's Mental and Emotional History | 8 |
| Mr. Brown's History of Prior Good Works | 10 |
| Mr. Brown's Community Support | 10 |
| Mr. Brown's Issues of Therapeutic Concern | 11 |
| Factors Militating in Favor of Downward Departure | 12 |
| Statistical Information | 12 |
| Factors Militating in Favor of a Variance from the Advisory Guidelines | 14 |
| Recently Sentenced Possession of Child Pornography Cases | 14 |
| Mr. Brown's Status as a First Offender | 16 |
| Alternatives to Imprisonment/Use of Substitute Punishments | 16 |
| Certainty vs. Severity of Punishment | 18 |
| The Need for Compassion and Mercy | 19 |
| Conclusion | 19 |
| Appendix I Exhibits | A-J |
| Appendix II Exhibits (*Letters of Support*) | 1-8 |

## Comprehensive Sentencing Mitigation Report

Case No. 3:22-cr-106-MMH-LLL
Joshua Thomas Brown

### Introduction

According to the provisions of 18 U.S.C. § 3553, the court shall impose a sentence that is sufficient but not greater than necessary, to comply with statutory purposes of sentencing, and in determining such sentence, the court shall consider, inter alia, (1) the nature and circumstances of the offense and the history and characteristics of the defendant and (2) the need for the sentence imposed set forth in § 3553(a)(2). In consideration of the sentence that must be imposed in this case, Joshua Brown respectfully requests that the Court consider the following information in mitigation of his sentence:

### Mr. Brown's Current Posture

*The Defendant's Response to His Status*

On May 31, 2023, Mr. Brown pleaded guilty to one count of possession of child pornography. He has entered into a written plea agreement with the government and has acknowledged responsibility for the offense as charged. Mr. Brown has remained completely cooperative with the government and has fulfilled the terms of his plea agreement. He has fully come to terms with his error in judgment since the government's case against him has come into fruition. Mr. Brown greatly laments his involvement in this offense, and the associated harm to myriad child victims, as well as the costs and inconvenience to the government and the people of the United States.[1]

According to the presentence report, Ms. Brown was arrested and made an initial appearance on August 30, 2022, and was subsequently detained. Mr. Brown has been in pretrial detention without incident. As of the date of sentencing, Mr. Brown will have been detained for approximately 14 months.

---

[1] Brown, Joshua. 7 July 2023. Personal interview.

1

*Collateral Consequences of the Offense*

In addition to the usual consequences of incurring a felony conviction, such as loss of certain basic civil rights, Mr. Brown will be forever labeled as a sex offender and will be forced to spend long years incurring the implications of that stigma. This is especially noteworthy because prior to his involvement in the instant offense -- consistent with his age -- Mr. Brown lived an exemplary life.  He will be 28 years of age at the time of sentencing, and the designation of sexual offender will effectively be a label for life.[2] By being labelled a sex offender, Mr. Brown will also incur the obstacles of similarly situated persons who have trouble with housing, employment, and other aspects of community relations.[3]  At such a youthful age, the effects of this labeling on Mr. Brown will last for a much longer duration than the typical child pornography offender.[4]

**<u>Nature and Circumstances of the Offense/Factors in Mitigation of the Offense</u>**

Although the offense of conviction is serious, there are several factors in mitigation of the circumstances of the offense that the court may wish to consider according to the provisions of USSG §1B1.4 (<u>Information to Be Used in Imposing Sentence; Selecting a Point within the Guideline Range or Departing from the Guidelines</u>).[5]  These factors, in combination, militate in favor of the position that the instant offense was committed in the least onerous light possible under the circumstances.

---

[2] Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. USSG §5H1.1. Age (Policy Statement.)

[3] Collateral consequences are legal and regulatory sanctions and restrictions that limit or prohibit people with criminal records from accessing employment, occupational licensing, housing, voting, education, and other opportunities. https://niccc.nationalreentryresourcecenter.org/. <u>National Inventory of Collateral Consequences of Conviction</u>.

[4] For fiscal year 2021, the average age of an offender sentenced for  a child pornography offense was 41 years – a 13-year difference between the average age and Mr. Brown's age. USSC: Quick Facts – Child Pornography Offenders FY2021 Datafiles.

[5] "A court is not precluded from considering any information that the guidelines do not take into account determining

First, according to the presentence report, Mr. Brown has zero criminal history points, and has a designation of criminal history category I. He has had no prior interaction with law enforcement for any reason. In contravention to the titular nature of the offense, not only does Mr. Brown have no history of violence or antisocial behavior, but there is also no hint of information in his background suggesting a proclivity toward harming children, or any inordinate interest or sexual attraction to children. Moreover, Mr. Brown has no history of criminal sexual dangerous behavior, or "CSDB," which the Sentencing Commission associates with a set of the three most salient factors in aggravation in non-production child pornography cases.[6]

Those factors are the **content** of the offender's child pornography collection, the nature of the offender's collecting behavior, the **community** -- or the offender's degree of involvement with other offenders -- particularly in an internet community devoted to child pornography and child sexual exploitation, and the offender's **conduct**, or his engagement in sexually abusive or exploitative conduct in addition to the child pornography offense.[7] While the nature of the content of the images involved in this case are typical of non-production cases,[8] Mr. Brown has no footprint of involvement with other offenders, nor any history of engagement in sexually abusive or exploitative conduct in addition to the pornography offense.

---

a sentence within the guideline range or from considering that permission in determining whether and when asked to depart from the guidelines." USSG §1B1.4, comment. (backg'd.).

[6] USSC 2012 Report to Congress on Federal Child Pornography Offenses – Executive Summary.

[7] USSC Publication Report at a Glance: Federal Sentencing of Child Pornography Offenses - Non-Production Offenses, June 2021.

[8] Ibid. Over half (52.2 percent) of non-production child pornography offenses in fiscal year 2019 included images or videos of infants or toddlers, and nearly every offense (99.4 percent) included prepubescent victims.

Second, not only do the guidelines calculations take into effect almost <u>all</u> of the specific offense characteristics contemplated by the Sentencing Commission, there is much evidence to suggest that the application of the child pornography guideline has a strong tendency to overstate the seriousness of the offense, since "the §2G2.2 produces an unreasonable sentencing range in part **because the enhancements apply just about all the time and operate exponentially** [*emphasis added*]."[9] United States v. Grober, 595 F.Supp.2d 382, 397-402 (D.N.J 2008). Given this anomaly, it is virtually impossible for the Court to adequately personalize Mr. Brown's actual conduct within the context of his history and characteristics.

Third, as outlined later, Mr. Brown has a significant history of adverse childhood experiences, and as discussed in the presentence report, he was suffering from the onset of anxiety and depression prior to the inception of the offense behavior.  There is extant research indicating that anxiety and depression can be central to the development of addiction to pornography.[10]  The literature further reveals that addiction to pornography constitutes a behavioral addiction.  Accordingly, Mr. Brown's mental condition is plausibly related to, and may attenuate, the nature and circumstances of the offense.

<u>**Mr. Brown's General History and Characteristics**</u>

The following information regarding Ms. Brown's history and characteristics is offered as a supplement to the very thorough presentence investigation and report conducted by the United States Probation Office:

---

[9] "Constrained by statutory mandatory minimum penalties, congressional directives, and direct guideline amendments by Congress in the PROTECT Act of 2003, §2G2.2 contains a series of enhancements that have not kept pace with technological advancements. **Four of the six enhancements— accounting for a combined 13 offense levels—cover conduct that has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2.**[Emphasis added]." <u>Update to Commission's 2012 Report to the Congress, Federal Child Pornography Offenses: Non-Production Offenses</u> - Key Findings. (<u>See</u> Appendix I, Exhibit A for most recent frequencies of specific offense characteristics applied in cases involving §2G2.2.)

[10] A person might use pornography to escape psychological distress. <u>What to Know About Porn Addiction</u>. MedicalNewsToday. April 11, 2023, https://www.medicalnewstoday.com/.

Although not reflected in the presentence report, the path for Mr. Brown's developmental problems may have begun prior to birth with several of his ancestors having possible heritable psychological or psychiatric conditions.  On his father's side, his grandmother suffered from anxiety disorder.[11]  His maternal grandmother also suffered from anxiety disorder, while his mother's father suffered from schizophrenia.[12]  In 1987, Mr. Brown's father, Thomas Brown, was diagnosed with bipolar disorder and was prescribed antidepressant medication.[13] Thomas Brown stated that his mother was "crazy, psychologically unstable, who was treated with shock therapy and lithium; she had anxiety disorder and was a horrible mother."  Thomas Brown further reported that when he was age eight, during a break on journey with his biological father on a train, his father excused himself to go buy cigarettes and never returned.  Thomas Brown stated that this event had a profound emotional effect upon him.

According to the presentence report, in 1988, Mr. Brown's father was convicted of felony offenses in Duval County, Florida.  Although Mr. Brown would not be born until 1995, these preliminary events would have future ramifications on his trajectory of human growth and development.

Two years after Mr. Brown's birth, his father was arrested and convicted of loitering and prowling. He was sentenced to five days jail. His father stated that from the age of two, Mr. Brown exhibited a precocious form of intelligence by scoring very highly on arcane games such as *SameGame*, and eventually built computers for his friends.  Mr. Brown's father stated that Mr. Brown is "the smartest person I know." His mother stated, however, that Mr. Brown was "very awkward since kindergarten." As he progressed

---

[11] Brown, Thomas. 25 April 2023. Personal interview.

[12] Brown, Karen. 23 April 2023. Personal interview.

[13] Brown, Thomas. August 16, 2023. Personal interview.

5

through elementary school, Mr. Brown was subjected to verbal abuse from his peers.  This lead to him being bullied while in the 6th grade.

By this time, it was becoming apparent that Mr. Brown would have no friends among his peers until he reached the 11th grade.  During that school year Mr. Brown met Christian Austin-Datta, who would become his best friend. Unfortunately, in addition to having been socially isolated for his entire childhood prior to meeting Mr. Austin-Datta, Mr. Brown required earlier remedial help with his schoolwork.  Nevertheless, Mr. Brown participated on the Brain Brawl team while at Atlantic Coast High School.  Mr. Brown graduated from high school at age 18.  He subsequently attended college at the University of North Florida, graduating with a degree in computer science in 2017, at age 22.

Less than a year later, Mr. Brown began working as a software engineer at CSX Corporation. He held this position until his arrest on the instant offense.  Subsequent to starting employment at CSX, his mother confirmed that at age 23, Mr. Brown began dating Madison Trupia. Mr. Brown's relationship with Ms. Trupia was complicated by pressure placed on him to pay the rent on a home occupied by Ms. Trupia, as well as being responsible for myriad bills generated by Ms. Trupia's mother and family.  Mr. Brown was subsequently sued for eviction from the residence, which ended in final judgment on December 20, 2022.[14]

Conterminously with the financial pressures incurred by Mr. Brown in his relationship with Ms. Trupia, the dynamics of the relationship wreaked emotional havoc on Mr. Brown because Ms. Trupia delayed physical intimacy in their relationship, explaining to Mr. Brown that she had been psychologically injured after having previously been sexually molested.  She promised Mr. Brown that on New Year's Eve 2019, she would allow him to kiss her for the first time.  Before that happened, however, Mr. Brown witnessed Ms. Trupia kissing another man in June 2019.

---

[14] Appendix I, Exhibit B.

According to Mr. Brown, and as confirmed by his mother, Mr. Brown "went on a downward spiral and never got over [Ms. Trupia]." The relationship lasted for 10 months. Considering Mr. Brown's past history of social isolation with regard to friendships and relationships, this development was traumatic for Mr. Brown due to the acute heartbreak, leading to the relationship's abrupt ending, and his feeling of having been financially exploited by Ms. Trupia. In response to this catastrophic event, Mr. Brown sought psychological intervention to deal with ensuing depression. Mr. Brown's depressive state was augmented by the additional isolation of the overlay of the COVID-19 pandemic, which official began on about March 11, 2020.[15] Mr. Brown's seclusion was further enhanced by his mother's absence from the home because beginning in May 2020 through May 2022, she traveled intermittently to Utah to visit Mr. Brown's father, where he was domiciled for professional purposes.

The timeline of the forgoing events reflect pressures and circumstances difficult for Mr. Brown to manage in the approach to the instant offense behavior. The earliest date of relevant conduct was July 8, 2022. Consequently, for the 24-month period prior to the detection of the offense, Mr. Brown was under burgeoning substantial emotional distress associated with his relationship naivete with Ms. Trupia, which resulted in him being financially and emotionally exploited. Literature indicates that relationship difficulties can lead to problematic porn use.[16] Combined with his history of ACES, Mr. Brown's association with relationship pressures may have influenced his inclination to engage in the possession and collection of the images for which he has now been convicted.

---

[15] On March 11, 2020, the World Health Organization (WHO) declared COVID-19, the disease caused by the SARS-CoV-2, a pandemic. https://www.yalemedicine.org/news/covid-timeline.

[16] What Causes Porn Addiction? PsychCentral, https://psychcentral.com/sex/what-causes-porn-addiction.

**Mr. Brown's Mental and Emotional History**

The following chart summarizes the nature of several adverse childhood experiences ("ACES") he

encountered from birth through age 17:

Adverse Childhood Experiences – Quick Reference

| Category | Was it Present? | | Brief Description | Documentation |
|---|---|---|---|---|
| | ✓ | Score | | |
| Physical Abuse | ✓ | 1 | Father's physical striking left visible marks on body | Self-reported |
| Sexual Abuse | - | - | - | - |
| Emotional (verbal) Abuse | ✓ | 1 | Regular swearing/verbal insults; fear of physical harm by father | Self-reported; mother |
| Physical Neglect | - | - | - | - |
| Emotional Neglect | ✓ | 1 | Father treated friends better than family; felt unloved at times | Self-reported; mother |
| Household Mental Illness (chronic depression and suicidal issues in the household) | ✓ | 1 | Father suspected of having BPD, depression, multigenerational anxiety disorder; brother has clinical intellectual disabilities | Self-reported |
| Mother Treated Violently | - | - | - | - |
| Parental Divorce | ✓ | 1 | Parents have been informally and perennially separated | Mother |

8

| Incarcerated Relative[17] | - | - | - | - |
|---|---|---|---|---|
| Household Substance/ Alcohol Abuse | ✓ | 1 | Brother used street drugs | Self-reported; brother |
| *Total ACE Score*[18] | | 6 | | |

Given Mr. Brown's history and his psychologically challenged background and based on the science of ACES research on brain development, Mr. Brown has a profile that is recognized by psychologists that compromises volitional functioning that would have been present at all times during the commission of the offenses of conviction. Accordingly, this circumstance should be factored into the calculus of factors at sentencing.[19]

Consistent with Mr. Brown's history of emotional concerns is his history of substance abuse, which began at age 26, less than two year prior to the beginning of the offense conduct, with the use of marijuana/CDB edibles. He has acknowledged that he would benefit from drug aftercare treatment during his interview with the probation officer. Although according to §5H1.4. Physical Condition, Including Drug or Alcohol Dependence or Abuse, et al. (Policy Statement), drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure, Mr. Brown's history of substance abuse may have been sequela to the circumstances and the irregularities of his childhood, as well as in response to the depression associated with the unpleasant breakup of his singular adult romantic relationship.

---

[17] According to the presentence report, approximately seven years prior to Mr. Brown's birth, his father was convicted of serious felony offenses and was sentenced to 10 years imprisonment. He was released prior to Mr. Brown's birth. Consequently, no ACE point was ascribed to this circumstance. When Mr. Brown was age two, his father was convicted of a misdemeanor offense and was sentenced to five days Duval County Jail.

[18] A Centers for Disease Control-Kasier Permanente ACE study found that adults with an **ACE score of 4 or more were at significantly greater risk for many behavioral, physical, and mental health issues later in life**. https://www.joiningforcesforchildren.org/what-are-aces/.

[19] Mr. Brown's mother reported that he has a generational history of psychiatric problems on both sides of his family. His maternal grandmother suffered from anxiety disorder. His paternal grandmother also suffered from anxiety disorder and was treated with both shock therapy and lithium.

Accordingly, those factors may be incorporated into the calculus regarding the need for the sentence imposed to ensure that the sentence is not greater than necessary under 18 U.S.C. § 3553(a)(2).

### Mr. Brown's History of Prior Good Works

Despite his relative youth, Mr. Brown has been involved in several initiatives demonstrating good citizenship and concern for others. His mother confirmed that while in high school, Mr. Brown contributed volunteer community service at the Teacher's Supply Depot, Jacksonville, Florida.[20] Ms. Brown further confirmed that Mr. Brown participated in volunteer service to the No More Homeless Pets organization, which included donating food and supplies for the benefit of the animals. Mr. Brown also participated in community service by helping to make ramps for the homes of disabled veterans. Finally, while in college, Ms. Brown confirmed that Mr. Brown did volunteer project work for the Jewish Community Alliance, Jacksonville, Florida.

While according to §5H1.11. Military, Civic, Charitable, or Public Service; Employment-Related Contributions; Record of Prior Good Works (Policy Statement), civic, and similar prior good works, are not ordinarily relevant in determining whether a departure is warranted, they are not forbidden from consideration for downward departures. Even if Mr. Brown's background in civic and community service does not rise to the level for a ground for a departure in this case, such service, particularly at such a young age, within the context of other positive aspects of Mr. Brown's history and characteristics, may be incorporated into an analysis of factors in favor of a variance under the provisions of 18 U.S.C. § 3553(a).

### Mr. Brown's Community Support

Mr. Brown continues to receive the unwavering support and encouragement from his extended family members. He has a strong network of concerned family and friends interested in his future. As

---

[20] Id. Karen Brown.

10

such, they can aid and encourage Mr. Brown to comply with all aspects of his sentence, as well as help
bring about improvements in his condition.

Some of Mr. Brown's supporters have written letters on his behalf.  They are appended to this
report for the Court's consideration.[21]  Their collective sentiment is that Mr. Brown is good-hearted,
selfless, and dependable.  Generally speaking, each of the letter writers have attested to a specific
knowledge of Mr. Brown's background and disavows that he presents an ongoing threat to any part of
the community.  Each of them acknowledges the inappropriateness of his conduct and his need to bring
about an improvement in his condition.

### Mr. Brown's Issues of Therapeutic Concern

As described earlier,  and in the presentence report, Mr. Brown's entire life has been affected by
the influence of adverse childhood experiences.  These circumstances have converged in a manner that
presents obstacles to his long range emotional functioning.  Mr. Brown acknowledged to the probation
office that he would benefit from a mental health evaluation and treatment.

According to 18 U.S.C. § 3553(a)(2)(D), one of the factors to be included in the calculus of the
need for the sentence imposed is to "provide the defendant with needed … medical care, or other
correctional treatment in the most effective manner."  Since Mr. Brown has received no prior
psychological intervention addressing the impact of his history of trauma-inducing ACES, it is anticipated
that the sentence will incorporate mental health treatment whether the sentence involves custody or
community supervision.  Accordingly, Mr. Brown's willingness to participate in treatment militates in favor
of the imposition by the Court of the least onerous sentence possible.

---

[21] Appendix II, Exhibits (1-9).

**Factors Militating in Favor of Downward Departure**

According to USSG §5K2.0(a)(4), [a]n offender characteristic or other circumstance identified in Chapter Five, Part H (Offender Characteristics) or elsewhere in the guidelines, as not ordinarily relevant in determining whether a departure is warranted, may be relevant to this determination if such offender characteristic or other circumstance is present to an exceptional degree. There is a combination of two or more offender characteristics, or other circumstances, which distinguish this case from the typical cases contemplated by the Sentencing Commission, that strongly suggests a downward departure from the advisory guideline sentencing range. USSG §5K2.0(c).

In conformity with USSG §5H1.3. Mental and Emotional Conditions (Policy Statement), [m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually, or in combination with other offender characteristics, are present to an unusual degree, and distinguish the case from the typical cases covered by the guidelines. In this case, Mr. Brown's developmental years – both prepubescent and later adolescence – were replete with acute circumstances involving adverse childhood experiences, for which he has never received proper professional intervention or treatment. Those historical circumstances – very likely forming a nexus to the instant offense -- were described above and may distinguish the case from the typical cases covered by the guidelines.[22] Accordingly, this combination of circumstances may represent a factor that the Court finds warrants a departure from the applicable guideline imprisonment range.

**Statistical Information**

The Sentencing Commission maintains statistics on the rate and the degree of below range sentences in cases of child pornography offenses. Nationally, in FY2022, there were 1,435 child (non-

---

[22] Research suggests that a person might use pornography to escape psychological distress. What to Know About Porn Addiction, https://www.medicalnewstoday.com/articles/porn-addiction.

12

production) pornography cases sentenced.  Of that number, 63 percent of cases received a below range sentence not sponsored by the government.[23]  Furthermore, the Commission maintains statistics on a combination of variables impacting the actual sentences imposed within the nation that largely define the comparative configurations of those sentences.   To assist courts in making relative comparisons of similarly situated cases using the precise metrics in the sentencing table, the Commission has created the Judicial Sentencing INformation system ("JSIN").[24]

Prior to findings by the Court, the total offense level in this case is 28 and the criminal history category is I, calling for an advisory **guideline range of 78 to 97 months**.  According to the information supplied by the JSIN (FY2018-2022), the median and mean sentences imposed for §2G2.2 cases within that cell in the sentencing table was **54 months imprisonment**.

As exemplified below in the section on recently sentenced cases, to depart and/or vary from this finding would be clearly consistent with the majority of courts around the country that encounter the challenge of sentencing non-production of child pornography offenders.  Should the court exercise its discretion to sentence Mr. Brown according to the advisory guidelines range, the resulting sentence would constitute a sentence of 34 months (39 percent) <u>above</u> what might be reasonably required under the metrics of the JSIN.[25]  As demonstrated earlier, and below in factors warranting a variance, such a sentence may be somewhat arbitrary, and not reflective at all of the defendant's individual condition but

---

[23] Appendix I, Exhibit C.

[24] "JSIN will provide cumulative data based on five years of sentencing data for defendants sentenced under the same primary guideline, and with the same Final Offense Level and Criminal History Category selected. These innovations have made the Commission's guidelines, data, and information more accessible and user-friendly for Congress, judges, litigants, probation officers, researchers, and members of the public." Breyer, Charles. Announcement of the 2018 edition of the Guidelines Manual. To all recipients of the Guidelines Manual. 15 September 2021.

[25] This determination is based on a sentence at the presumptive middle of the range of 88 months.

13

would suggest the possibility of an unwarranted sentence disparity.  This data is instructive in determining what may constitute a conventional "heartland" for sentences imposed for this particular offense.

### Factors Militating in Favor of a Variance from the Advisory Guidelines System

In addition to the defendant's unique history and characteristics as acknowledged by the probation office that may warrant a sentence outside the advisory guidelines system, 18 U.S.C. § 3553 (a)(6) urges the court to avoid unwarranted sentencing disparities. Courts have found that §2G2.2 is "fundamentally different" from most of the guidelines, and that "unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires."  United States v. Dorvee, 616 F.3d 174 (2d Cir. 2010).

Consequently, under the circumstances of this case, the defendant's lack of past or present involvement in child pornography communities, and the total absence of any prior criminal sexually dangerous behavior (CSDB), a sentence according to the guidelines imprisonment range might promote a substantial sentencing disparity.  The court may disagree with the Sentencing Commission as a matter of policy and find that a sentence under the advisory guidelines system would constitute a sentence that is greater than necessary under the provisions of 18 U.S.C. § 3553(a)(1).  Accordingly, for this reason, as related to the overall abundance of factors in mitigation unique to Mr. Brown, a variance from the advisory guidelines system may be warranted.

### Recently Sentenced Possession of Child Pornography Cases

Since it is imperative that the court consider similarly situated offenders in its § 3553 analysis, the following examples will serve to illustrate recent sentences imposed on similarly situated defendants across the country:

14

- United States v. Joseph Dominic Konegan, Middle District of Florida, 3:19-cr-48-J-32PDB: Convicted of Possession of Child Pornography.  Sentenced to **48 months imprisonment** on October 2, 2019.[26]

- United States v. Reece Christohper Depew, Middle District of Florida, 3:20-cr-00013-BJD-PDB: Convicted of Possession of Child Pornography. Sentenced to **57 months imprisonment** on April 21, 2023.[27]

- United States v. William Nobles, Middle District of Florida, 2:18-cr-89-JLP-NPM: Possession of Child Pornography. Sentenced to **60 months imprisonment** on February 19, 2021.[28]

As illustrated by the above sentencings, consistent with research by the Sentencing Commission, together with the priority of courts throughout the country in rationalizing sentencings in non-production of child pornography cases in an evidence-based manner, courts are less reliant on the metrical nature of the non-production guideline.  Consequently, they are increasingly imposing non-government sponsored departures or variances based on the near absence of rationality in the non-production guideline.

The listed cases are but representative samples of a number of cases where the courts have imposed sentences more in line with the individual nature and circumstances of the offense, as well as the history and characteristics of the offenders.  The offense conduct typified in the examples above is largely compatible with the severity of the conduct ascribed to Mr. Brown in the instant offense. Accordingly, under an analysis of § 3553 factors, this information may be relevant to the calculus of the possibility of an unwarranted sentencing disparity, and the imposition of a sentence that is greater than necessary.

---

[26] Appendix I, Exhibit D.

[27] Appendix I, Exhibit E.

[28] Appendix I, Exhibit F.

## Mr. Brown's Status as a First Offender

As a first offender, Mr. Brown ordinarily would be integrated into the group of offenders who would the least likely to reoffend. Since he has been convicted of an offense involving the (non-production) exploitation of minors, the Sentencing Commission distinguishes the actuarial likelihood of reoffending for these offenders from other forms of crime.  In a major study released in June 2021 on federal sentencing of child pornography non-production offenses, the Commission found that the overall recidivism rate of 1,093 non-production child pornography offenders was 27.6 percent three years after release from incarceration (or the commencement of probation).[29]  Of those offenders, 16.0 percent were arrested for a crime that was not a sex offense or related to the offender's status as a sex offender.  Only 4.3 percent of offenders were rearrested for a sex ["real-time" victims] offense within three years.

By comparison, the general rate of recidivism for federal offenders in criminal history category I was <u>higher</u> than that for non-production offenders at 30.2 percent.  Consequently, any consideration that the court may have regarding most of the factors listed at 18 U.S.C. § 3553(a)(2), such as the need to afford adequate deterrence or the protection of the public, is very likely sated by the fact of Mr. Brown's status as a first offender – even based on a conviction of an offense involving receipt of child pornography.

## Alternatives to Imprisonment/Use of Substitute Punishments

Since Mr. Brown's offense is a Class C Felony, he is statutorily eligible for a term of probation should the Court grant a departure, based on combination of factors, or a variance (or both) from the advisory guideline system.[30]  Accordingly, there are alternatives available for the Court to impose a

---

[29] Id. Update to Commission's 2012 Report to the Congress.

[30] *See, e.g.*, United States v. Grams, 566 F.3d 683, 686–87 (6th Cir. 2009) (per curiam) (In contrast to a departure, "a 'variance' refers to the selection of a sentence outside of the advisory Guidelines range based upon the district court's weighing of one or more of the sentencing factors of § 3553(a).").

16

sentence of probation, or to fashion a sentence using the schedule of substitute punishments at USSG §5C1.1(e)(2) and (3).  Those sections provide for the use of community confinement (i.e., a residential reentry center – "RRC") and/or a sentence with home detention as an intermediate sanction and are not precluded by statute.  Additionally, direct court commitments to a RRC are permitted under the law and BOP policy.[31]  Mr. Brown's extraordinary history and characteristics, and his mental and emotional condition, merits strong consideration for this option in this case.

According to 28 U.S.C. 994(g), there is a statutory bias toward considering the impact of prison overcrowding on the application of the sentencing guidelines.[32]  As of September 28, 2023, the total number of prisoners in the Federal Bureau of Prisons is 158,542.[33]  As of February 2022, "BOP facilities are at an average of 98.8 percent of their capacity [...] 93 institutions are over their rated capacity."[34]  Recent trends regarding an evidence-based philosophy towards sentencing encourage the use of sentencing alternatives, including the use of probation.[35,36]

Consistent with the statutory imperative on prison overcrowding is the coextensive issue of gross understaffing of BOP facilities nationwide.  This problem has been recognized as a safety concern for both

---

[31] Appendix I, Exhibit G.

[32] "[...] [T]he sentencing guidelines prescribed under this chapter shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission."

[33] https://www.bop.gov/about/statistics/population_statistics.jsp#pop_report_cont.

[34] https://www.forbes.com, Statistics Show Federal Bureau Of Prisons Unable To Implement Key Policies During Crisis.

[35] "The Task Force recommends that the USSC, as it revises its Guidelines for drug offenses, encourage probation for lower-level drug trafficking offenses." Final Recommendations of the Charles Colson Task Force on Federal Corrections.  From the World Wide Web, Colson-Task-Force-Final-Recommendations-January-2016.

[36] The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself. 18 U.S.C. § 3561. Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned to meet fully the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant. USSG Ch.5, Pt. B, intro. comment.

staff and inmates.[37]  The issue has even reached the level of Congress, prompting Sen. Dick Durbin, Chair

of the Judiciary Committee to issue a statement on the safety and working conditions of BOP employees.[38]

Furthermore, the impact of the staffing failure is augmented by the fact that professionals such as

teachers and psychologists have been compelled to serve as correction officers in response to the dearth

of filled positions.[39]

### Certainty vs. Severity of Punishment

Mr. Brown has pleaded guilty to an offense punishable by a term of up to 20 years imprisonment.

While the plea agreement offers a benefit to Mr. Brown, he is faced with the certainty of 78 months

imprisonment, should the Court impose a sentence according to the advisory guidelines system.  Mr.

Brown will be 28 years of age at the time of sentencing and faces the risk of an inopportune absence from

his family.  Additionally, Mr. Brown has mental and emotional problems, which will make the service of

any term of imprisonment more onerous than would otherwise be the case.  Mr. Brown recognizes that

whatever sentence the court imposes, it will require his most fervent attention and compliance with the

Court's order.

Given Mr. Brown's acceptance of responsibility and strong factors in mitigation articulated

throughout this report, a sentence under the advisory guideline system would produce no additional

statutory benefit to society, given Mr. Brown's unique history and characteristics.  Criminological research

to date indicates that increases in the <u>certainty</u> of punishment, as opposed to the <u>severity</u> of punishment,

---

[37] Appendix I, Exhibit H.

[38] Appendix I, Exhibit I.
[39] Appendix I, Exhibit J.

is more likely to produce deterrent benefits.[40]  Mr. Brown understands and is impressed by the reality of a certain term of imprisonment.

### The Need for Compassion and Mercy

*"I have always found that mercy bears richer fruits than strict justice."*

- Abraham Lincoln

Mr. Brown understands that he is in need of compassion and mercy from the court as he prepares for sentencing.  He is convicted, not only legally, but personally, and morally, for his involvement in the offense.  Despite all of the factors in mitigation articulated above, Mr. Brown now appreciates the peril that he has visited upon himself and his family, as well as the harm to the minor victims.  He understands that he is at the mercy of the Court.

As noted by the United States Court of Appeals for the Second Circuit, "the opportunity to plead for mercy is another provision in a procedural body of law designed to enable our system of justice to mete out punishment in the most equitable fashion possible, to help ensure that sentencing is particularized, and reflects individual circumstances."[41]  Mr. Brown humbly asks the court to particularize his sentence, and prays that it reflects his individual circumstances, and those of his family, based on the principles of compassion and mercy that are within the province of the court.

### Conclusion

In consideration of the forgoing discussion and analysis, there is ample evidence in mitigation encouraging the Court to fashion a sentence either in departure, or at variance, or both, from the advisory guidelines system.  This position is particularly supported by the unempirical and unreliable nature of the

---

[40] Wright, Valerie Ph.D., <u>Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment</u>, The Sentencing Project. November 2010.

[41] United States v. Singh, 877 F.3d 107 (2d Cir. 2017).

19

guideline at §2G2.2, as well as the compromised nature of Mr. Brown's psychological deficiencies that significantly inform both the nature and circumstances of the offense and the history and characteristics of the defendant.  In addition, recent case sentencings and statistical information from the sentencing commission reveal that the advisory guideline range suggest a sentencing range incongruent with sentences typical imposed on possession of child pornography offenders.  Mr. Brown thanks the Court for its time and consideration in reviewing this report.  Mr. Brown respectfully requests that the Court utilize this information to impose a sentence that is "sufficient but not greater than necessary" under the circumstances of this case.

The forgoing comprehensive sentencing mitigation report has been prepared on behalf of the Defendant at the request of defense counsel and is submitted in support of sentencing before the Honorable Maria Morales Howard, Chief United States District Judge in the United States District Court, for the Middle District of Florida, Jacksonville Division.

Respectfully submitted,

/s/ *C.R. Dawson*

_____
Carlos R. Dawson
Sentencing Mitigation Consultant
The Cord Strategies Group, LLC
Jacksonville, Florida
crd@cordstrategiesgroup.com